Um, Mr. Caulfield, whenever you're ready. Good morning, your honors. I'm Tim Caulfield. I represent the appellant, Adonia Smith, and may it please the court. I'd like to focus first this morning on Smith's claim that LCPS terminated her on the basis of her disability of deafness. The district court erred in two respects with respect to this claim. First, the district court erred by applying a McDonnell Douglas pretext analysis to this claim. And second, I think in a similar manner, the district court also erred by concluding that Smith had to prove that the school's disability-based discrimination was the only cause of her termination. Um, McDonnell Douglas does not apply to her disability-based discrimination claim because this claim is a direct evidence discrimination claim. It does not, it does not turn away. At the end of the day, we just have to decide whether there was a triable issue or fact. Supreme court has told us, don't get, don't get too wrapped up around these proof schemes on appeal because they're intended for the orderly presentation of, uh, of evidence before the trial court and that on appeal, um, our ultimate determination is whether there's an issue of triable fact. And, uh, regardless of this and that aspect of a, a, um, uh, McDonnell Douglas case and, and the overall question, I think that I had, first of all, uh, um, it, it, it's clear that the, uh, uh, plaintiff has had a, had a disability and, and, and nonetheless rendered some very constructive, uh, service, um, and for that, um, I think everyone can certainly, um, respect her contributions. The, the problem was, I think that the, um, there was an awful lot of evidence here that, um, the discharge here, um, setting aside the failure to, failure to accommodate on which you prevailed. So you will be eligible for attorney's fees on that. But the wrongful discharge claim, um, seemed to have rather little to do with the disability and a great deal to do with problems in interpersonal relationships, it just seemed to be, uh, reluctant to be a team player. Um, and, and, um, you know, every workplace, every school system is really in need of, of team players, people who give a little bit and take a little bit and, and the difficulty was that her views as to the approach, um, of, uh, instruction for the hard of, of hearing, she was committed to the American Sign Language approach, which may be all well and good, but if you didn't agree with her, um, she wasn't really willing to, to listen. It was kind of a my way or the highway business and you just can't run a, can't run a railroad with people who just saying nothing but my way, but my way or the highway. That was a, that was part of the problem. Well, Your Honor, interpersonal issues were the primary reason that LCBS gave her a termination and you cannot separate interpersonal issues. You cannot separate, um, Smith's ability to interact with her colleagues from the fact that she is deaf. She cannot listen. She cannot speak unless she has an interpreter and in the absence of an interpreter, which has already been established, was, was discriminatory. In the absence of an interpreter, this is what the school required her to do to try to be a team player. She had to walk around with a little whiteboard, writing notes to people. She would have text message conversations face to face with something while the teachers and administrators around her were talking and she would have no idea what they were saying. I think the issue of, it comes down, I agree, Your Honor, it comes down to the issue of causation was discrimination, disability-based discrimination, a but-for cause of her discharge, and that is a trial worthy issue, Your Honor. Could I just, I have to sort of, I'm not sure I understand what, what you think is the direct evidence of discrimination. Well, it's two parts. First, the school failed to accommodate her disability, uh, by failing to provide a daily interpreter or adequate ASL interpreting services. So there's our discrimination. It's the ADA defines discrimination to mean among other things. That's what you're, okay. There's the discrimination. Um, so discrimination in this context is a little bit different from the animus that you would see in a, in a race-based discrimination case or something like that. And was that, that what kept her from completing her IEPs in a timely manner, which I think you have to acknowledge is the case, or providing lesson plans or VGLA binders or taking home student data, which apparently violated state regulations? Well, Your Honor, these are paperwork related issues and... But they are, but aren't they grounded in state requirements? I believe the VGLA binders were a state requirement. IEPs are also a state requirement. And, but the evidence on these points, um, on each of these issues shows that the, the extent to which, uh, they were true, they were true problems is, is disputed. Uh, the testimony... Well, whether going to, whether or not one violates a state requirement and whether or not it's a problem, it is certainly discipline worthy, is it not? Well, I would agree that violating a state requirement would be discipline worthy, but the question here is whether she would, would have been terminated, whether they would have taken away her job in the absence of discrimination. And the, the step that I... That was why I was asking, was the failure to accommodate a factor in any of the instances in which she, um, failed to meet the due date for her students, VGLA binders, which teachers were required by state law, uh, to collect, um, whether or not she took home student binders to complete, which was a violation. I mean, the, the discrimination that you rely on does not seem to, the, the in the, some of the legitimate disciplinary reasons. And I think to, to hold that the discrimination has to play a role in every reason they give for her termination is to place a higher burden on Smith than the law requires. All that she has to... Well, actually she, she could, um, I'm not sure that's correct, but there's a number of, uh, skipping meetings for which an interpreter had been scheduled without notifying anyone, calling in consecutively for sick leave when she denied leave to go to a conference, when she acknowledges that she went to the conference, there's a fair amount of insubordination in this record that one would think could be viewed cumulatively. Well, I think that's a jury question, Your Honor. The, the decision to not renew her contract was actually made before there were any issues with the VGLA binders. Um, that, and the two documents that led to her, the, the school's decision not to renew her contract, both emphasized her failure to, um, interact effectively with her colleagues. But a big part of it to come back was the failure to keep these records. And a lot of the things that she failed to do were designed to assist disabled students, in other words, allowing a substitute teacher as necessary or classroom observation, that, that would seem to me a quality control that was necessary, but keeping the records enables the school system to follow the progress of a hearing impaired student. And it lets you know if the students are making progress and it's absolutely necessary for funding of the school system, so, and funding of disability programs, so the things that she, many of the things she failed to do were things that were intended to help and assist hearing impaired students and the, the record keeping is essential because it, it lets parents and school administrators and others know whether actual progress, educational progress for a particular student is being made. So you're in a position of saying, well, she was thrown out for failing to do things that were actually assisting the disabled population at the school and she failed. Well, whether Smith had issues with IEP management or paperwork, these are hotly disputed issues. She testified that there was only one IEP that was ever late and the reason it was late is because a parent didn't sign it on time. She testified that these VGLA binders that she, she completed them to, to the extent that her students had completed the standards that she had to record in them. She did the record keeping stuff, but they weren't completed in time in, in the sense that she was not able to document that they completed standards that they were unable to attain. But to, to come back to the point of causation here, on her disability-based discrimination claim, this, this court has held that disability need not be the only or sole cause of the plaintiff's termination. The question is whether, whether if she had had an interpretation. I don't think that's what the Loudon School District is, is contending. To get back to what Judge Duncan said, it was an accumulation of causes here. Many and most of which seem completely unrelated to a disability because of the disability didn't prevent the maintenance of records of a student's progress. Well, I think that's a factual issue for the jury. I think that what's not, unless it's not, unless it's somehow put, put in, into dispute. Well, with respect to the IEPs, that is a disputed fact that they were late. She test, she agreed that one IEP, a total of one IEP was late. And it was late for a reason that should not have led to her being terminated because it was because a parent wouldn't sign it. She testified that all of her lesson plans were completed. And then we had, I think it was two witnesses that corroborated that. But again, I want to emphasize the but-for causation standard here. It's not a sole causation standard. So I don't think anyone's contending that it is. It's just the problem is there has to be an issue, a genuine issue of material fact. And the question is whether there's a genuine issue of causation. Whether so many instances, it's not just one thing. It's a, it's not, it's a failure to provide lesson plans, a failure to keep the American Sign Language approach, the unwillingness to allow observation of her performance, not allowing substitute teachers when it might have helped the students to have had them. It just begins to, to pile up to the point that the genuineness issue in Rule 56, the genuine dispute is, is not, not there. That's, that's the problem. It's the accumulation of, of difficulties. But anyway, you, you're going to have some, some rebuttal time here. Thank you, Your Honor. I'm, I'm, I'm out of time. I'd like to. Because if we have questions, I want you to stay right there. Bill, do you have anything you want to ask? No. Thank you. Thank you. Mr., Ms. Judkins, let's hear from you. May it please the Court. Julia Judkins on behalf of the Loudoun County Public School System, the school board. The focus I argue to you should be on, at the summary judgment stage, what the plaintiff did not do. As Judge Kachiris pointed out in his memorandum opinion, it is important to not come forward with any evidence to dispute, number one, that she was late with her IEP plans. All she said at that stage was, it wasn't my fault. But there was uncontested evidence that in the event a parent will not sign the IEP plan, then what you have to do is go with the same plan. But you have to come to the table and have a plan in effect. This is not just a state requirement. This is a federal requirement because these are 504 plans and school systems can... And all of these requirements are intended, have one aim in mind, and that is to assist the educational progress of disabled students. That's the whole, that's the irony of the whole thing is that the aspects of a job on which she fell down were all intended to help the disabled population make their contributions to the well-being of the communities around them. Yes. And these are highly structured plans that involve multiple individuals. So that, she did not refute that at the summary judgment stage. She has a different story now, but that's not what's before the court. She specifically has alleged, we terminated her because of her disability. We retaliated against her because of her disability. But not only, she did not refute the IEP. She never refuted, in fact, her own documentation unequivocally supported, she did not do the requisite documentation for the VGLA binders. This was a new thing in place that year to document the progress of children who could not take the SOLs. So what you have to do is just keep examples of their work. That's what the evidence was unrefuted. You have to keep examples of their work that show progress, because if there's no progress, then you're not meeting the measurable goals. And she didn't keep the documentation. She said in her own emails, I'm not going to be able to get these done on time. It's not my fault. The children can't do SOLs. The children shouldn't be measured against these standards. That was her dispute. Not that she couldn't get the information because she didn't have an interpreter. In fact, Judge Kachiris points out, most of the time, the issues she was having with people, including interpersonal relationships, she had interpreters. She had interpreters. She had interpreters in her meetings with the principal. She had interpreters in her IEP meetings. She had interpreters when she was dealing with these colleagues. And in two instances, she didn't even need an interpreter. One of the colleagues was deaf. Eileen McCartan was deaf herself. She'll argue, well, she had cochlear implants. She's not truly deaf. This philosophical difference of opinion on how to teach deaf children was the underpinning of everything that led. She's the architect of her own disaster because her excuse for the VGLA binders was not that I didn't have an accommodation. It's never been that. It was that I don't agree with how the state and the federal government are trying to accommodate hard of hearing and deaf students, total communication. I'm sorry, that's the decision maker. Even the principal didn't have the discretion to ignore the total communication direction that they were going in. That's because federal law and state mandate the least restrictive environment. And the least restrictive environment is one that you have to take the family's consideration into how to communicate. Some of these children could speak, partial hearing, and that her philosophical difference led to the inability to meet federal and state timelines, which had the federal government found out, had the parents gone in and complained, there are huge sanctions for this, and that's the reason for the termination and the reason that she was not retaliated against in any way, she took the binders home. She did not dispute that at the summary judgment stage. She never did. She violated the law and took them home. And the reason they don't want you to take them home is they don't want you to manufacture the stuff you didn't have all the way through the school year that you were supposed to have. They don't want you to make up reports. And that's against the law too. And how can the school system maintain the integrity of the data? The integrity of the progress reports and to allow the children to progress? This is all focused on managing children's with disabilities so they can progress, have measurable goals. She failed across the board in that. Even when she had the accommodations she wanted, interpreters, and the phone had nothing to do with any of the reasons she was terminated. These were documented even before Brenda Yoakum's became the principal. The prior principal documented late IEPs, documented failure to get along with colleagues, documented the fact that she had interpersonal relationships. And Ms. Smith, in her response to that, never said anything. There's a written response in the record. She said, it's not my fault. The other teacher was condescending. So everything is not my fault. So what they really are asking you all to do is sit in the place of multiple people who were dealing with this and say, okay, you understand. I think that the briefs and the questioning and everything's gone over this pretty carefully. I'm going to, at this point, I'm going to ask Judge Traxler and Judge Duncan, if they have some questions for you. We have no questions, but we do thank you. Thank you. All right. Mr. Caulfield, you have some rebuttal time here. Thank you, Your Honor. I'd like to direct the court's attention to the unsatisfactory evaluation that resulted in Smith's non-renewal of a contract. It's on page 271 of the joint appendix, and it lists two things. There's reasons that her performance was unsatisfactory and her contract would not be renewed. It lists issues with planning and assessment and instruction. The second thing it lists is professionalism and communication with colleagues. And this is what LCPS said. They said, Smith does not consistently exhibit a cooperative approach in the interactions with colleagues. She has failed to develop a positive rapport with colleagues. This is a central reason to why they terminated her. It is not the place of a court in a pretrial motion to decide, hey, the fact that she didn't have an interpreter, that had nothing to do with why she was terminated. Well, I'm sorry. She was reprimanded for sending away a deaf teaching assistant by writing on the blackboard, she's deaf, she cannot help me. That's documented. She texted the principal that she wasn't comfortable having an oral deaf person in her classroom because it was against deaf culture, JA 631. There are, it's not, it doesn't relate to the failure to accommodate. These are affirmative statements by her that demonstrate a lack of willingness to engage with the administration and with her colleagues. Well, Your Honor, she didn't have the ability to engage with the administration and with her colleagues. That's not, saying that she wasn't comfortable having an oral deaf person in her class because it was against deaf culture has nothing to do with her inability to engage with. It's just, she's saying she's not comfortable dealing with someone who is oral in deaf. That's, that's her. Well, again, there's nothing in the ADA that requires Smith to be a perfect employee. There's nothing in the ADA that says she can't voice concerns. The only thing, well, the only thing you raised the fact that one of the comments was the interpersonal relationships and some of those are documented and some of those are at her own feet and at least some of them have nothing to do with having an interpreter. That was my only point. I don't think we can make the assumption that, that any of the issues she had in interactions with people were independent of the lack of an interpreter. We can if she says they, I mean, if what she gives us excludes that. Well, for example, the, you just, you just gave it as an example, the, the incident where she wrote on the board, this, this teacher, this substitute teacher can't help me, she's deaf. The, the issue there was what she needed was an interpreter to help her communicate with someone and the school sent her someone who was deaf and so you therefore could not interpret for her. So that, that was, I think that's why she wrote that. And we go into detail in our brief, other examples where she was reprimanded for reasons that just had to do with misunderstandings, like she was when the interpreter that had been assigned to the meeting had left and she couldn't, she couldn't participate in the meeting. It's placing too high of a burden on, on Smith to say, Hey, you have to have been a perfect employee to be able to bring a wrongful discharge claim under the Americans with Disabilities Act. They didn't accommodate her disability. That's clear discrimination under this act. And then they provided a reason for her termination that is directly related to the communication access she needed. The, the question for the jury here is if she'd had an accommodation, if she had an interpreter, would she have been fired? Maybe she still would have, maybe she would have had paperwork issues, but that's not the question is whether all of the issues that LCPS could come up with would have been resolved. The question is if she had had an interpreter and there hadn't been any discrimination, would she have been fired? And I think a reasonable jury could, could look at this situation and say, no, she wouldn't have been fired. They'd have worked with her on this paperwork stuff. They'd have had more patience with her, but they didn't do that. We've got the discrimination. And I think it's the job of the jury to draw, it's the right of a jury to look at all the evidence and decide that, Hey, this discrimination was a but for a cause of her termination. I think the proof's in the pudding there. It's, it's in the documents that they, that LCPS produced to support her termination, was it the only reason? No, but as this court has remarked in Gentry and in other cases, disability does not have to be the only or the sole cause of a, of a termination decision for a plaintiff to prevail under the ADA. Thanks, sir. Thank you, your honors. We'll adjourn court and come down and greet counsel.
judges: J. Harvie Wilkinson III, William B. Traxler, Jr., Allyson K. Duncan